# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58607-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JAMES LYLE HOISINGTON, | |
| Appellant. | |

CHE, J. — After responding to a report of an individual riding a lawn mower away from a home improvement store around 2 a.m., police found James Hoisington standing by his car, which had a trailer attached to it and a riding lawnmower atop the trailer. A jury found Hoisington guilty of first degree theft.

Hoisington appeals his convictions and sentence, arguing that (1) he received ineffective assistance of counsel, (2) the trial court deprived him of due process by allowing pro hac vice counsel to represent him, (3) the record does not reflect that he knowingly, intelligently, and voluntarily waived his constitutional right to testify, (4) insufficient evidence supported his conviction, (5) the State engaged in prosecutorial misconduct during closing argument, (6) the trial court denied his right to proceed self-represented, (7) his offender score is incorrect, and (8) cumulative error deprived him of a fair trial. He also raises several additional arguments in a statement of additional grounds (SAG).

We disagree with all of Hoisington's claims except that we agree the trial court improperly included one of Hoisington's Arizona convictions in his offender score. Accordingly, we affirm Hoisington's convictions and remand for resentencing.

FACTS

Shortly after 2 a.m., law enforcement received a report of a person riding a lawnmower westbound behind a home improvement store. The responding officer encountered a small car with a trailer attached to it with a green riding lawnmower[1] on the trailer. A man in a black hoodie with a white logo, later identified as James Hoisington, was standing near the car and claimed he was there mowing grass near the railroad tracks behind the buildings for Catlin Properties. The officer noticed that there were no grass clippings underneath the lawnmower's deck and the discharge on the lawnmower was zip tied, indicating it had not been used. When Hoisington could not provide any information on Catlin Properties, the officer inspected the grass near where Hoisington claimed to have been mowing and observed that the grass was brown and dead and did not appear recently mowed.

Judd Kainz was working overnight as a night operations supervisor at the home improvement store. While he was working, police officers came to the door and brought him to where Hoisington was standing with the green riding lawnmower and trailer. Kainz took photos of the serial number plate on the lawnmower and the VIN on the trailer and sent them to the district senior asset protection manager for the home improvement store, Scott Patronaggio, who confirmed the items were still listed as part of the home improvement store's inventory and

---

[1] The term riding lawnmower and tractor are used interchangeably.

belonged to the home improvement store. Additionally, the home improvement store retained the trailer title in its safe. Kainz also realized that an orange tractor was missing. Kainz believed the orange tractor had been returned by a customer. But Patronaggio did not have any records indicating that the orange tractor had been returned to the store.

Kainz and the officers walked to the area where the lawnmowers should have been. There, they found two wire security cables that had been securing the lawnmowers cut and on the ground. Near the cut cables, they discovered a saw and a gas can with the cap missing. They also noticed that some lumber had been arranged over the curb, presumably to assist with driving the lawnmowers around the security gates and away from the property.

Patronaggio accessed security video that showed a person cutting the cables and taking the lawnmowers off the property. The video showed an individual in a black hoodie with a white logo ride the two lawnmowers away from the property. According to Patronaggio's internal report, on the day of the theft, the trailer was valued at $929, the green lawnmower at $4,199, and the orange lawnmower at $3,999.

When law enforcement arrested Hoisington, they found a gas cap on his person. The cap fit on the gas can that was found near where the lawnmowers had been stolen.

The State charged Hoisington with first degree theft. Ian Maher was appointed as his defense counsel. Maher moved for the limited admission to practice under APR 8(b) of Cecelia Andrews, an experienced attorney in Arizona and Texas, who was in the process of becoming licensed in Washington. The trial court granted Andrews' pro hac vice admission with Maher as her supervising attorney.

At trial, Hoisington rested without calling any witnesses or testifying in his defense. The trial court did not notify Hoisington of his right to testify.

After trial adjourned for the day, Hoisington brought a handwritten letter to the prosecutor's office informing them that he intended to file a self-represented motion for a mistrial. The next day, Hoisington presented his counsel and the trial court with a self-represented motion for a mistrial. When questioned about it by the trial court, Hoisington explained that he was unhappy with his defense counsel's performance and felt he was not receiving a fair trial. Hoisington complained that his counsel, Andrews, was not licensed in Washington State and questioned why she chose not to introduce what he claimed was exculpatory evidence. Hoisington complained, "I should have been afforded the opportunity to testify and present my evidence, but my attorney, who had all these continuance[s], didn't feel it was necessary, for some reason." Rep. of Proc. (July 27, 2023) (RP) at 267-68 (trial).

Maher explained that the exculpatory evidence Hoisington wanted to introduce included stickers that may have been affixed to the stolen property. Maher suggested that the evidence may have been more inculpatory than exculpatory and had a questionable foundation. Maher defended Andrews' experience and performance at trial. The prosecutor agreed that Andrews appeared extremely competent and had "done the best she could with what she [had] in front of her." RP at 271.

Andrews clarified to the trial court that she had a conversation with Hoisington the day prior to trial about the trial strategy. Andrews asked Hoisington if he wanted to testify and he told her that he did not based on the fact that he had prior convictions for crimes of dishonesty with which the State could impeach him.

4

Hoisington reiterated his dissatisfaction with trial counsel and told the trial court "I don't want [Maher] to represent me, either. As a matter of fact . . . [counsel] you're fired and [other counsel] you're fired. I'll do the closing myself. Because I'm not going to have somebody represent me that isn't going to deal with the facts. And, like I say, you don't throw a chicken in with a wolf and think that it's going to work out right. And [the prosecutor] being the wolf and the chicken is sitting over here. I don't feel like being his dinner." RP at 274. The trial court responded "Well, if you represent yourself for the remainder of this case, that's exactly what will happen." RP at 274. Hoisington appeared to ultimately decide to continue with counsel by stating, "we might as well finish up with what we've got going," but reiterated that he did not feel comfortable with either Maher or Andrews. RP at 275.

The trial court denied the motion for a mistrial and denied Hoisington's request to excuse counsel "based on where we are in this case." RP at 276. The court noted that pro hac vice was an acceptable way of practicing in Washington and Andrews had appeared in at least one trial before the same court prior to Hoisington's trial.

During its closing argument, the State reiterated the evidence introduced at trial to argue that Hoisington stole the two lawnmowers and the trailer and the total value was more than $5,000. The State reiterated the jury instructions, "Keep in mind one thing. When I'm speaking, when Ms. Andrews is speaking, what we say is not evidence. We are pointing out to you what we believe the evidence shows. You ultimately get to decide what the facts are. Then you get to apply those facts to the law." RP at 290.

In arguing how the jury could know that the trailer was stolen, the State referred to Patronaggio's testimony.

5

We also know that the trailer was stolen because you heard the testimony from Scott Patronaggio. He has a pretty lofty title. He's the regional—I can't remember everything that he said, but he's the Regional Asset Protection and Safety Operations Manager for the region. He's not just some flunky we threw up there. He's the man. But you get to decide the credibility of all witnesses, it's not me that decides. You get to decide.

RP at 291-92. Hoisington did not object to this argument.

The State also called the jury's attention to a picture of the wheel well of the trailer and argued "We've all bought new tires before, I would assume. Look at the tread on the tire. You'll see little rubber knobbies sticking up like hairs. They haven't had the chance to be worn off yet. This is a brand new trailer." RP at 293. Hoisington did not object to this argument.

Regarding the orange tractor, the State referred the jury to the security video footage and Patronaggio's testimony.

How do we know the [orange tractor] was stolen? You watch the video. He's on that [orange tractor]. Patronaggio says, "I checked the inventory. I checked the system. That [orange tractor] was still supposed to be on the property." Well, it wasn't, because—and it's time stamped in one of those photographs 12:58 a.m. on September 23rd, 2021, in the middle of the night when [the home improvement store] is closed. He's driving and off the property at the same time. He is carrying a gas can onto the property at the same time. You see him hiding the [saw] behind the pallet. That's how we know the [orange tractor] is stolen.

RP at 293-94. Hoisington did not object to this argument.

Hoisington argued in closing that the State had failed to prove he was the person in the photos and security video seen stealing the items and that the State failed to prove the market value of the items.

At the conclusion of closing arguments and after the jury had been excused, both defense counsel and the State made a record that Hoisington had been making distracting comments and arguing during both parties' closing arguments. Specifically, Maher informed the trial court that

6

Hoisington invited him to a fight during the noon hour. Maher stated that Hoisington had been "a complete distraction to his own defense." RP at 309.

On July 27, the jury found Hoisington guilty as charged. On August 10, Hoisington filed a second self-represented motion for a new trial. In his motion, Hoisington reiterated his complaints about his defense counsel and argued that he was denied a fair trial.

On August 14, at a sentencing hearing on Hoisington's offender score, the State argued that Hoisington's offender score was 9. Hoisington argued that two prior Arizona convictions for third degree burglary were not legally or factually comparable to any Washington offense and should not be included in the offender score, thereby making his offender score 7.

The State produced a copy of the Arizona indictment which showed, in relevant part, that Hoisington had been charged with two counts of third degree burglary. The indictment stated:

> Count One: Burglary in the Third Degree, a Class Four Felony
>
> On or about the 22nd day of December, 2010, James Lyle Hoisington committed burglary in the third degree of a fenced commercial or residential yard, belonging to Patricia Taylor, in violation of A.R,S, §§ 13-1506, 13-603, 13-701, 13-702, 13-703, 13-801, 13-804 and 13-811.
>
> Count Two: Burglary In The Third Degree A Class Four Felony
>
> On or about the 22nd day of December, 2010, James Lyle Hoisington committed burglary in the third degree of a non-residential structure, belonging to Patricia Taylor, in violation of A.R,S, §§ 13-1506, 13-603, 13-701, 13-702, 13-703, 13-801, 13-804 and 13-811.

Clerk's Papers (CP) at 147 (most capitalization omitted). The clerk's minutes from the Arizona trial show that the jury found Hoisington guilty "as alleged in COUNT [number] of the Indictment." CP at 149.

After reviewing the language of the relevant Arizona and Washington statutes, the trial court determined that the Arizona statute is narrower than the Washington statute and, therefore, was legally comparable.

In the middle of the hearing, Hoisington moved to dismiss his appointed counsel. He argued that Andrews did not take his calls or prepare for his defense. Hoisington reiterated his displeasure with Andrews' pro hac vice license status and argued that she should have put on more evidence in his defense at trial. The trial court denied Hoisington's motion to dismiss counsel, explaining "the fact that the trial didn't come out the way you hoped is not a basis for me to relieve your attorney. She's admitted under Washington admission to practice rules, so she's perfectly proper acting as an attorney here. And you haven't given any tangible reason to me for why I should relieve your attorney, at this point." RP (Aug. 14, 2023) at 337 (sentencing).

Andrews informed the trial court that when she first met with Hoisington, she informed him that she was licensed in Arizona and Texas and had applied for Washington admission. The trial court continued the sentencing hearing at Hoisington's request. At the subsequent sentencing hearing on August 21, the trial court imposed a standard range sentence of 48 months.

Hoisington appeals.

## ANALYSIS

### I. INSUFFICIENT EVIDENCE

Hoisington argues that insufficient evidence supported his conviction for first degree theft. We disagree.

Evidence is sufficient to support a conviction if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime

beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014). Circumstantial evidence and direct evidence carry equal weight. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004).

To convict Hoisington of first degree theft, the State was required to prove that he committed theft of property which exceeded $5,000 in value. RCW 9A.56.030. Theft is defined as "wrongfully obtain[ing] or exert[ing] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020.

A.      *Value*

Hoisington argues that the State failed to prove the value of the stolen property was greater than $5,000. Specifically, he argues that because there was conflicting testimony as to whether the orange riding mower had been returned for repairs or was new, the evidence of value was insufficient. We disagree.

"Value" refers to the market value of the property at the time and in the general area of the crime. RCW 9A.56.010(18)(a). Market value is an objective standard and consists of the price a well-informed buyer would pay to a well-informed seller. *State v. Morley*, 119 Wn. App. 939, 943, 83 P.3d 1023 (2004).

In determining the value of an item, evidence of price paid is entitled to great weight. *State v. Melrose*, 2 Wn. App. 824, 831, 470 P.2d 552 (1970). "Evidence of retail price alone may be sufficient to establish value." *State v. Ehrhardt*, 167 Wn. App. 934, 944, 276 P.3d 332 (2012). The jury can consider changes in the property's condition that would affect its market value. *Id.* Value need not be proven by direct evidence as the jury may draw reasonable inferences from the evidence. *Id.*

Here, the State presented evidence through Patronaggio's testimony that the value of the trailer was $929, the green lawnmower was $4,199, and the orange tractor was $3,999. Hoisington bases his argument on appeal on a statement made by Kainz that the orange tractor lawnmower may have been a customer return for repairs. But Patronaggio testified that the orange tractor was new and valued at $3,999. When asked if he had any records to suggest that the orange tractor was at the home improvement store for repairs, Patronaggio testified that he did not. Taking this evidence in the light most favorable to the State, as we must, this evidence is sufficient to prove that the total value of the stolen property was over $5,000.

Moreover, even if the orange tractor's value is removed from consideration, the value of the stolen property was still over $5,000. Hoisington does not dispute that the evidence established that the green lawnmower was valued at $4,199 and the trailer at $929, which combines to be over $5,000 and is sufficient to support a first degree theft conviction. Hoisington's argument fails.

B.    *Identity*

Hoisington also argues that the State failed to prove that he was the person who stole the items. We disagree.

At trial, the State produced evidence showing that a man in a black hoodie walked behind the home improvement store with a gas can. That same man drove an orange tractor lawnmower and a green lawnmower away from the home improvement store. Police encountered Hoisington, who was wearing a black hoodie, nearby and in possession of the missing trailer and green lawnmower. Detectives also found a discarded gas can with the cap missing near the cut security cables where the lawnmowers had been stored. When Hoisington was searched incident to arrest, officers found a gas cap that fit the gas can in his possession.

Circumstantial evidence and direct evidence carry equal weight. *Varga*, 151 Wn.2d at 201. And in a challenge to the sufficiency of the evidence, we accept the truth of the State's evidence and all reasonable inferences to be drawn therefrom. Here, taking the evidence in the light most favorable to the State, the evidence admitted at trial is sufficient to show that Hoisington was the person who stole the lawnmowers and trailer that had a combined value of over $5,000. Thus, Hoisington's claim that insufficient evidence supported his conviction fails.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Hoisington argues that he received ineffective assistance of counsel. We disagree.

To show ineffective assistance of counsel, the appellant must demonstrate that their attorney's performance was deficient and the deficient performance prejudiced the appellant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). We engage in a strong

11

presumption that counsel's performance was reasonable. *Id*. To overcome the presumption and show that trial counsel was deficient, "'the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)). To show prejudice, the appellant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *State v. Johnson*, 12 Wn. App. 2d 201, 210, 460 P.3d 1091 (2020).

A. *Inferior Degree Offense Instruction*

Hoisington argues that he received ineffective assistance of counsel based on counsel's failure to request an inferior degree offense instruction. We disagree.

A defendant who requests an inferior degree offense instruction is entitled to it if "(1) the statutes for both the charged offense and the proposed inferior degree offense 'proscribe but one offense'; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense." *State v. Fernandez-Medina*, 141 Wn.2d 448, 453, 6 P.3d 1150 (2000) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)).

Hoisington argues that counsel should have requested an instruction on second degree theft as an inferior degree of first degree theft. Even if Hoisington was entitled to the instruction and he could show that counsel performed deficiently by not proposing it, we hold that Hoisington fails to establish that he suffered prejudice.

Hoisington asserts that had the jury been instructed on the inferior degree offense, the jury could have reasonably found that the evidence supported the conclusion that he committed only second degree theft. But it is not enough that it is possible the jury could have arrived at a different verdict; Hoisington must show a "reasonable probability" that, but for the lack of the inferior degree instruction, the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694.

Hoisington makes no such showing. The jury returned a guilty verdict on first degree theft. Presuming, as we must, that the jury followed the trial court's instructions and would not have convicted Hoisington of first degree theft unless the State met its burden of proof as to that charge, the availability of an inferior degree offense on which to convict would not have made a difference. *Id.* ("[A] court should presume . . . that the judge or jury acted according to the law."); *Grier*, 171 Wn.2d at 34.

Moreover, the evidence produced at trial was clear that the stolen items had a total value of over $5,000, as required to prove first degree theft. Patronaggio testified that on the day of the theft, the trailer was valued at $929, the green riding lawnmower at $4,199, and the orange tractor at $3,999. Even without the value of the orange tractor included, the value of the green riding lawnmower and the trailer attached to Hoisington's vehicle was greater than $5,000. Hoisington therefore fails to demonstrate that had the jury been instructed on the inferior degree offense as he suggests here, the jury would have departed from the charged offense of first degree theft to convict him instead of the inferior degree offense of second degree theft. We hold that Hoisington has not shown prejudice, and his claim of ineffective assistance of counsel based on not requesting an inferior degree offense instruction fails.

B.      *Valuation*

Hoisington argues that he received ineffective assistance of counsel based on his attorney's failure to challenge the valuation of the stolen items. We disagree.

Hoisington's counsel cross-examined Patronaggio as to the value of the items. Specifically, she questioned Patronaggio as to whether the orange tractor had been returned for repair. In closing, counsel argued that the State had failed to prove that the combined value of the items was greater than $5,000. It is unclear what more Hoisington believes counsel should have done to challenge the stolen items' value. As such, he fails to show that counsel performed deficiently, and his ineffective assistance claim fails.

### III.  PRO HAC VICE COUNSEL

Hoisington argues that his due process rights were violated because Andrews did not comply with the requirements of APR 8(b) when representing him at trial. We disagree.

APR 8(b)(ii)(1) provides that with permission of the court, a member of another state's bar may appear in any action "in association with an active lawyer member of the Bar, who shall be the lawyer of record therein, responsible for the conduct thereof, and present at [all] proceedings unless excused by the court or tribunal" and that "[t]he [application] shall be heard by the court or tribunal after such notice to the . . . adverse parties as the court or tribunal shall direct." "The purpose of this rule is twofold: to provide '(1) reasonable assurance that the [out-of-state] attorney is competent and will conduct [themselves] in an ethical and respectful manner in the trial of the case, and (2) reasonable assurance that local rules of practice and procedure will be followed.'" *In re Pers. Restraint of Lewis*, 200 Wn.2d 848, 865, 523 P.3d 760 (2023) (alterations in original) (quoting *Hahn v. Boeing Co.*, 95 Wn.2d 28, 34, 621 P.2d 1263 (1980).

14

Hoisington contends that Andrews failed to properly comply with the requirements of APR 8(b) by failing to adequately inform him of her pro hac vice status[2] and by failing to have an active lawyer member of the bar association present at all proceedings. But Hoisington fails to show what is required to "adequately inform" a client of an attorney's pro hac vice status or that APR 8(b) requires the attorney to inform the client of their pro hac vice status. Hoisington also fails to provide any authority to support his contention that the alleged noncompliance with APR 8(b) deprived him of due process or warrants relief. Our Supreme Court has held that "not every technical defect in an attorney's license status rises to the level of a Sixth Amendment violation." *Lewis*, 200 Wn.2d at 872. Hoisington fails to show that Andrews' alleged noncompliance with APR 8(b) constituted any defect of constitutional dimension.

IV. WAIVER OF RIGHT TO TESTIFY

Hoisington argues that reversal is required because the record does not show that he knowingly, intelligently, and voluntarily waived his constitutional right to testify at trial. We disagree.

The United States Supreme Court has recognized that a criminal defendant has a constitutional right to testify on his or her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). On the federal level, the defendant's right to testify is implicitly grounded in the Fifth, Sixth, and Fourteenth Amendments. *Id.* at 51-52. In Washington, a criminal defendant's right to testify is explicitly protected under our state constitution. Wash. Const. art. I, § 22. This right is fundamental and cannot be abrogated by

---

[2] Andrews disputed this claim, specifically recalling that she told Hoisington of her pro hac vice status the first time they met.

defense counsel or by the court. *State v. Thomas*, 128 Wn.2d 553, 558, 910 P.2d 475 (1996).

Only the defendant has the authority to decide whether or not to testify. *Id.*

Hoisington argues that "there is a complete lack of evidence indicating that Mr.

Hoisington made a valid waiver of his right to testify or that his waiver was made knowingly and

voluntarily." Br. of Appellant at 36. But the trial court has no obligation to inform defendants of

the right to testify nor to obtain an on-the-record waiver of the right when a defendant appears

with counsel. *Thomas*, 128 Wn.2d at 559 ("the United States Constitution imposes no obligation

on trial judges to inform defendants of [the right to testify on one's own behalf]. . . . We believe

that the right to testify belongs in the category of rights for which no on-the-record waiver is

required."). Hoisington provides no authority to the contrary, and his argument fails.[3]

## V. PROSECUTORIAL MISCONDUCT

Hoisington argues that the State committed prosecutorial misconduct by impermissibly

bolstering Patronaggio's credibility and arguing facts not in evidence during its closing

argument. We disagree.

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the

prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278

P.3d 653 (2012). Generally, we first evaluate whether the prosecutor's conduct was improper.

*Id.* at 759 If the prosecutor's conduct was improper, we then determine if the conduct prejudiced

---

[3] We recognize that, after trial, a silent defendant may assert a claim that his attorney unconstitutionally prevented him from testifying. *State v. Robinson*, 138 Wn.2d 753, 760, 982 P.2d 590 (1999). Such claims are addressed under the ineffective assistance of counsel test. *Id.* at 767. Here, Hoisington does not argue that his counsel actually prevented him from testifying.

16

the defendant. *Id.* at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.*

However, if the defendant fails to object to the State's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill intentioned that [a jury] instruction could not have cured the resulting prejudice." *Id.* at 760-61. Hoisington fails to meet this high burden.

Hoisington contends that the prosecutor improperly bolstered Patronaggio's credibility when it stated in closing, "He has a pretty lofty title. He's the regional—I can't remember everything that he said, but he's the Regional Asset Protection and Safety Operations Manager for the region. He's not just some flunky we threw up there. He's the man. But you get to decide the credibility of all witnesses, it's not me that decides. You get to decide." RP at 291-92. Hoisington did not object to the prosecutor's statements at trial.

Hoisington also argues that the State impermissibly argued facts not in evidence during closing when it claimed that Patronaggio testified that he had checked the home improvement store's inventory for the orange tractor and when it argued that the orange tractor was "new." Br. of Appellant at 52. Hoisington also did not object to these arguments at trial.

Even assuming arguendo that the prosecutor's statements were improper, Hoisington fails to show that they were so flagrant and ill-intentioned that a jury instruction could not have cured any resulting prejudice. *Emery*, 174 Wn.2d at 760-61. As the State itself reminded the jury multiple times, counsel's arguments do not amount to evidence and the jury is the sole judges of the credibility of each witness. Had Hoisington objected to the State's allegedly improper comments during closing, the trial court could have given an instruction reiterating as much and

17

obviating any prejudice. Hoisington failed to do so, and we hold that his prosecutorial misconduct claims are thus waived.

Hoisington also argues that his defense counsel rendered ineffective assistance by failing to object. As previously discussed, counsel's performance is deficient if it falls below an objective standard of reasonableness, and we strongly presume that counsel's performance was reasonable. *Vazquez*, 198 Wn.2d at 247-48; *Grier*, 171 Wn.2d at 33. To overcome this presumption, "the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *McFarland*, 127 Wn.2d at 336.

Counsel's decisions regarding whether and when to object fall firmly within the category of strategic or tactical decisions. *State v. Johnston*, 143 Wn. App. 1, 19, 21, 177 P.3d 1127 (2007). Accordingly, Hoisington fails to show that his counsel's strategic decision not to object constituted deficient performance.

## VI. RIGHT TO SELF-REPRESENTATION

Hoisington also argues that the trial court violated his constitutional right to self-representation when it denied his requests to proceed self-represented on July 27 and August 14. We disagree.

Although the constitutional right to self-representation is fundamental, it is neither absolute nor self-executing. Wash. Const. art. I, § 22; *Faretta v. California*, 422 U.S. 806, 819-21, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Madsen*, 168 Wn.2d 496, 504, 229 P.3d 714 (2010); *State v. Woods*, 143 Wn.2d 561, 585-86, 23 P.3d 1046 (2001). A defendant's request to proceed self-represented must be both timely and unequivocal. *State v. Stenson*, 132 Wn.2d 668, 742, 940 P.2d 1239 (1997) (trial court did not abuse discretion by denying request to proceed

self-represented based on conditional and equivocal statements). To make an unequivocal request "requires a defendant to 'make an explicit choice between exercising the right to counsel and the right to self-representation.'" *State v. Curry*, 191 Wn.2d 475, 490, 423 P.3d 179 (2018) (quoting *United States v. Arlt*, 41 F.2d 516, 519 (9th Cir. 1994)).

We review a trial court's denial of a request for self-representation for abuse of discretion. *Madsen*, 168 Wn.2d at 504. A trial court abuses its discretion if its decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons. *State v. Vermillion*, 112 Wn. App. 844, 855, 51 P.3d 188 (2002). The "court's discretion lies along a continuum, corresponding to the timeliness of the request." *Id.* at 855. If the request is made during the trial, "the right to proceed pro se rests largely in the informed discretion of the trial court." *Id.* (quoting *State v. Fritz*, 21 Wn. App. 354, 361, 585 P.2d 173 (1978)).

Hoisington's request to proceed self-represented on July 27 was both equivocal and untimely. After both the State and defense had rested their case at trial, Hoisington argued, self-represented, for a mistrial and purported to "fire" his two defense attorneys. RP at 274. The trial court briefly cautioned Hoisington about the risks of proceeding self-represented, and then Hoisington seemingly withdrew his request, stating "The bottom line to this is I will get my composure, I'll get my drink of water, and we might as well finish up with what we've got going." RP at 275. The trial court stated that it was denying the request to proceed self-represented based on where they were in the case—presentation of closing arguments. Given the late stage of trial and the equivocal nature of Hoisington's comments, we hold that the trial court properly exercised its discretion to deny the request to proceed self-represented and did not violate Hoisington's constitutional rights.

Hoisington then moved to dismiss his appointed counsel at a sentencing hearing to determine his offender score. While Hoisington moved to dismiss his defense counsel, he did not also state that he wished to proceed self-represented. Hoisington simply reiterated his dissatisfaction with his appointed counsel's performance. To the extent this amounted to a request to proceed self-represented, his request was also equivocal, in that it did not amount to an "explicit choice between exercising the right to counsel and the right to self-representation", and untimely, thus the trial court did not abuse its discretion by denying his motion to relieve counsel. *Curry*, 191 Wn.2d at 490.

## VII. OFFENDER SCORE

Hoisington also argues that the trial court erred by including two prior Arizona convictions for third degree burglary in his offender score calculation that were not factually or legally comparable to burglary in Washington. We agree that the trial court erred by including one of the Arizona convictions, but not the other.

Under the Sentencing Reform Act of 1981, chapter 9.94A RCW, the trial court uses the defendant's prior convictions to determine an offender score, which (along with the seriousness level of the current offense) establishes the defendant's presumptive standard sentencing range. *State v. Arndt*, 179 Wn. App. 373, 377, 320 P.3d 104 (2014). "We review the trial court's calculation of a defendant's offender score de novo." *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

When the defendant has out-of-state convictions, the trial court must determine whether the out-of-state offense is comparable to a Washington offense. *In re Pers. Restraint of Canha*, 189 Wn.2d 359, 367, 402 P.3d 266 (2017). When evaluating comparability, we apply a two-part

test. *Olsen*, 180 Wn.2d at 472. First, we determine if the offenses are legally comparable by comparing their elements. *Id.* Legal comparability exists when the out-of-state offense is the same or narrower than the Washington offense. *Id.* at 472-73. If the crimes are legally comparable, our analysis ends and the out-of-state offense is included in the defendant's offender score. *Canha*, 189 Wn.2d at 367.

If the offenses are not legally comparable, such as when the out-of-state offense is broader than the Washington offense, we determine whether the offenses are factually comparable by deciding if "the defendant's conduct would have violated a Washington statute." *Id.* The State has the burden to prove the comparability of an out-of-state conviction. *Olsen*, 180 Wn.2d at 472. If an out-of-state conviction involves an offense that is neither legally nor factually comparable to a Washington offense, the conviction may not be included in the defendant's offender score. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007).

Arizona's third degree burglary statute provides:

A. A person commits burglary in the third degree by:

1. Entering or remaining unlawfully in or on a nonresidential structure or in a fenced commercial or residential yard with the intent to commit any theft or any felony therein.

2. Making entry into any part of a motor vehicle by means of a manipulation key or master key, with the intent to commit any theft or felony in the motor vehicle.

A.R.S. 13-1506. A.R.S. 13-1501(13) defines structure as "any device that accepts electronic or physical currency and that is used to conduct commercial transactions, any vending machine or any building, object, vehicle, railroad car or place with sides and a floor that is separately

21

securable from any other structure attached to it and that is used for lodging, business, transportation, recreation or storage."

In Washington, a person is guilty of second degree burglary if, "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030. Washington defines "building" to include "any dwelling, fenced area, vehicle, railway car, cargo container, or any other structure used for lodging of persons or for carrying on business therein, or for the use, sale, or deposit of goods; each unit of a building consisting of two or more units separately secured or occupied is a separate building." RCW 9A.04.110.

Hoisington contends that that the Arizona third degree burglary statute is broader than Washington's second degree burglary statute based on Arizona's broad definition of structure. To support his argument, Hoisington relies on Washington's definition of "premises." But our inquiry is properly focused on the definition of "building" as that is the word used in the second degree burglary statute. Nonetheless, we hold that Washington's definition of building is narrower than Arizona's definition of structure. Specifically, Washington's definition does not include "any device that accepts electronic or physical currency and that is used to conduct commercial transactions, any vending machine or any building, object, vehicle, railroad car or place with sides and a floor that is separately securable from any other structure attached to it and that is used for lodging, business, transportation, recreation or storage." A.R.S. 13-1501(13).

22

Thus, Hoisington's two Arizona convictions for third degree burglary are not legally comparable to Washington's second degree burglary statute.[4]

Having determined that the convictions are not legally comparable, we must determine whether they are factually comparable. *Canha*, 189 Wn.2d at 367. That is, we assess whether Hoisington's conduct would have violated a Washington statute.

Hoisington argues that we cannot rely on the indictment to prove factual comparability. We disagree. We have held, "The sentencing court may 'look at the defendant's conduct, as evidenced by the indictment or information, to determine if the conduct itself would have violated a comparable Washington statute.'" *Arndt*, 179 Wn. App. at 379 (quoting *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 258, 111 P.3d 837 (2005)). We may only rely on facts in the out-of-state record if they are admitted to, stipulated to, or proved beyond a reasonable doubt. *Id.* Here, because the jury verdict found Hoisington guilty "as charged in COUNT [number] . . . of the indictment," the facts alleged in the indictment were proved beyond a reasonable doubt. CP at 149.

Based on the indictment and subsequent guilty finding, in Count 1 of the Arizona prior conviction, Hoisington was found to have committed third degree burglary "of a fenced commercial or residential yard." CP at 147. The Washington definition of building specifically

---

[4] The State concedes that the Arizona conviction is not legally comparable to the Washington burglary statute as to Hoisington's Arizona Count 1 but contends it is legally comparable for Count 2 based on the information in his indictment. But the State's position conflates legal and factual comparability. Because the Arizona third degree burglary statute is broader than the Washington statute, neither of Hoisington's convictions are legally comparable.

23

includes a fenced area. Thus, the first Arizona third degree burglary conviction is factually comparable for purposes of Hoisington's offender score.

As to the second Arizona conviction for third degree burglary, the indictment alleged that Hoisington committed third degree burglary "of a non-residential structure." A.R.S. 13-1501(10) defines a nonresidential structure as any structure, other than a residential structure and includes a retail establishment. A.R.S. 13-1501(13) defines structure very broadly: "any device that accepts electronic or physical currency and that is used to conduct commercial transactions, any vending machine or any building, object, vehicle, railroad car or place with sides and a floor that is separately securable from any other structure attached to it and that is used for lodging, business, transportation, recreation or storage." Based on this broad definition, the record is insufficient to determine whether Hoisington's conduct for the second Arizona conviction for third degree burglary would have violated a Washington statute.

Accordingly, we hold that the trial court did not err by including one Arizona third degree burglary conviction in his offender score, but agree with Hoisington that the State failed to prove comparability of the second Arizona third degree burglary conviction. Thus, remand for resentencing with a correct offender score is appropriate.

## VIII. CUMULATIVE ERROR

Hoisington argues that the cumulative impact of errors at trial deprived him of a fair trial. We disagree.

Under the cumulative error doctrine, the court may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant his or her right to a fair trial, even if each error alone would be harmless. *State v. Lazcano*, 188 Wn. App. 338, 370, 354

P.3d 233 (2015). Hoisington bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of his trial. *Id.* He fails to meet this burden because the accumulated prejudice from any errors did not affect the outcome of his trial, particularly in light of the overwhelming evidence of guilt.

## STATEMENT OF ADDITIONAL GROUNDS

In a SAG, Hoisington raises several additional claims, none of which warrant reversal.

Hoisington contends that his two 1986 convictions from Spokane County were for attempted second degree burglary, not second degree burglary, and therefore his judgment and sentence is invalid. To support his claim, Hoisington relies on facts outside of the trial record. Such claims must be resolved through a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

Hoisington also contends that his defense counsel and the prosecutor colluded to obtain a guilty verdict.[5] He also takes issue with Andrews' pro hac vice status. Andrews' pro hac vice status was challenged by appellate counsel and fully discussed above. Additionally, nothing in the record supports Hoisington's vague allegation that Andrews colluded with the prosecutor to obtain a guilty verdict. Rather, the record shows that defense counsel zealously and diligently appeared on Hoisington's behalf. Andrews made multiple objections, presented a coherent

---

[5] Hoisington also takes issue with Maher. He claims Maher "committed fraud" by signing the judgment and sentence as his attorney. SAG at 9. Maher was appointed as Hoisington's attorney of record and supervised Andrews while she appeared in pro hac vice status. Hoisington's vague claim involving Maher is insufficient to inform us of the nature and occurrence of the alleged error and we do not reach it. RAP 10.10.

defense theory to the jury, and successfully argued against the State's recommendation of a high end standard sentence.

Hoisington also claims that the State improperly shifted its burden of proof during closing argument by publishing a picture and purporting to be an expert on tires. Although Hoisington does not reference the record in his SAG, we assume he is referring to the State's argument that the trailer was stolen. The State called the jury's attention to a picture of the wheel well of the trailer and argued "We've all bought new tires before, I would assume. Look at the tread on the tire. You'll see little rubber knobbies sticking up like hairs. They haven't had the chance to be worn off yet. This is a brand new trailer." RP at 293.

The State is afforded wide latitude in making arguments to the jury and prosecutors are permitted to draw reasonable inferences from the evidence. *State v. Anderson*, 153 Wn. App. 417, 427-28, 220 P.3d 1273 (2009). We hold that the State's reference to the photo of the trailer wheel and the State's arguments about the condition of the tires did not improperly shift the burden or claim to be expert testimony. Rather, the State referenced an exhibit admitted at trial without objection and argued reasonable inferences from the evidence.

Hoisington further claims that the trial court abused its discretion by failing to rule on his second self-represented motion for a new trial. But Hoisington's motion was untimely. CrR 7.5(b) provides that a motion for a new trial must be served and filed within 10 days after the verdict. The jury's guilty verdict was returned on July 27 and Hoisington did not file his motion for a new trial until August 10. Hoisington did not move to extend the time to file the motion, nor does he offer any explanation for why the trial court should have considered the untimely motion. Accordingly, this claim fails.

Hoisington also claims that he received ineffective assistance of appellate counsel based on appellate counsel's "fail[ure] to properly address the many colorful issues related to this miscarriage of justice," and complains that appellate counsel purposefully delayed filing an opening brief in order to obstruct Hoisington's due process rights. SAG at 9. To succeed on an ineffective assistance of appellate counsel claim, Hoisington must show that the issues not raised by appellate counsel had merit and that the appellant was prejudiced by appellate counsel's failure to raise the issues. *In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013). Hoisington fails to meet this burden.

## CONCLUSION

In conclusion, we hold that Hoisington fails to show that he received ineffective assistance of counsel; Andrews' pro hac vice license status did not deprive Hoisington of his constitutional rights; the trial court did not violate Hoisington's right to testify by not inquiring on the record whether he wanted to testify; sufficient evidence supported the jury's finding that Hoisington was guilty of first degree theft; Hoisington waived his claims of prosecutorial misconduct by not objecting; the trial court did not abuse its discretion by denying Hoisington's untimely and equivocal requests to proceed self-represented, the trial court improperly included one of Hoisington's Arizona convictions in his offender score, and cumulative error did not deprive Hoisington of a fair trial. We further hold that none of the claims raised in Hoisington's SAG merit relief. We also hold that the trial court improperly included one of Hoisington's Arizona convictions in his offender score because the State failed to prove comparability.

Accordingly, we affirm Hoisington's convictions and remand for resentencing.

No. 58607-0-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Lee, P.J.

_____
Price, J.

28